UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| JAKE A. BEATTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:18 CV 22 ACL |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff Jake Beatty brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Beatty's severe impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy through his date last insured.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

### I. Procedural History

Beatty filed his application for benefits on December 10, 2014, claiming that he became

---

[1]After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

unable to work on December 20, 2007. (Tr. 132-38.) In his Disability Report, Beatty alleged disability due to lower back pain and a pinched nerve in his shoulder. (Tr. 164.) Beatty was 43 years of age at the time of his alleged onset of disability. His application was denied initially. (Tr. 71-74.) Beatty's claim was denied by an ALJ on March 9, 2017, following a hearing. (Tr. 15-28.) On February 20, 2018, the Appeals Council denied Beatty's claim for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Beatty first argues that the ALJ "failed to fully and fairly develop the record." (Doc. 17 at 3.) He next argues that the ALJ "failed to properly consider the Listings." *Id.* at 7.

## II. The ALJ's Determination

The ALJ first found that Beatty last met the insured status requirements of the Act on December 31, 2012. (Tr. 17.) He did not engage in substantial gainful activity during the period from his alleged onset date of December 20, 2007 through his date last insured of December 31, 2012. *Id.* In addition, the ALJ concluded that Beatty had the following severe impairments through his date last insured: degenerative disc disease ("DDD") and spondylolisthesis of the lumbar spine; spondylosis of the thoracic and cervical spine; and borderline intellectual functioning ("BIF"). *Id.* The ALJ found that, through the date last insured, Beatty did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18.)

As to Beatty's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that, through
> the date last insured, the claimant had the residual functional

capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except for the following nonexertional limitations that reduce the claimant's capacity for sedentary work: can no more than occasionally climb ladders, ropes, or scaffolds; can no more than occasionally climb ramps or stairs; can no more than occasionally balance, stoop, kneel, crouch, or crawl; can no more than occasionally be exposed to vibration; limited to simple, routine, and repetitive tasks; limited to simple work-related decisions; and can have no more than occasional interactions with supervisors, co-workers, and the public.

(Tr. 22.)

The ALJ found that Beatty was unable to perform any past relevant work through the date last insured, but was capable of performing other jobs existing in significant numbers in the national economy, such as lens inserter, patcher, and polisher. (Tr. 27-28.) The ALJ therefore concluded that Beatty was not under a disability, as defined in the Social Security Act, at any time from December 20, 2007, the alleged onset date, through December 31, 2012, the date last insured. (Tr. 28.)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on December 10, 2014, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2012, the last date insured.

*Id.*

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a

preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's

physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a

medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the

claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

The undersigned will discuss Beatty's claims in turn, beginning with the ALJ's evaluation of the Listings.

## A. Listings

Beatty first argues that the ALJ failed to properly consider the Listings. Specifically, Beatty contends that he meets the requirements of Listings 12.05 and 12.02.

The Listing of Impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (the "Listings") "describes for each of the major body systems impairments that [the Commissioner] considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). "The claimant has the burden of proving that his impairment meets or equals a listing." *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010). "To meet a listing, an impairment must meet all of the listing's specified criteria." *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

### 1. Listing 12.05

At step two, the ALJ determined Beatty suffered from the severe mental impairment of BIF. (Tr. 17.) The ALJ then proceeded at step three to find Beatty did not meet or equal the requirements of Listing 12.05. (Tr. 18.)

As an initial matter, Beatty contends that the ALJ erred in applying the requirements of Listing 12.05 "as amended and effective on January 17, 2017," because these amendments "are not retroactive." (Doc. 17 at 7.)

Beatty's argument lacks merit. The Social Security Administration ("SSA") recently amended the regulations at issue—including Listing 12.05—specifying the amendment would become effective on January 17, 2017. 81 Fed. Reg. 66138-66167 (Sept. 26, 2016). The SSA further indicated that the SSA would use the revised rules on and after their effective date, and that it expected federal courts to review decisions using the regulations in effect at the time of the final administrative decisions. *Id.* The ALJ's decision was issued on March 9, 2017. (Tr. 15-28.)

Because the revised regulations were in effect at that time, the ALJ properly considered the revised regulations. This Court will now consider whether the ALJ's decision was supported by substantial evidence.

Beatty contends that he meets the requirements of Listing 12.05(C), "Mental Retardation and Autism." Subsection (C), however, was removed in the amendment to the regulations effective January 17, 2017. Revised Listing 12.05(B)[2] requires that a claimant establish:

> 1. Significantly subaverage general intellectual functioning evidenced by a or b:
> a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
> b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
> 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
> a. Understand, remember, or apply information (see 12.00E1); or
> b. Interact with others (see 12.00E2); or
> c. Concentrate, persist, or maintain pace (see 12.00E3); or
> d. Adapt or manage oneself (see 12.00E4); and
> 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. pt. 404, Subpt. P, app. 1 § 12.05B (2017).

The ALJ found that the requirements of Listing 12.05(B) were not met because the record did not support sufficiently subaverage general intellectual functioning or significant deficits in

---

[2]The ALJ accurately found that Beatty did not meet Revised Listing 12.05(A), because that subsection requires a cognitive inability to function at a level required to participate in standardized testing of intellectual functioning. (Tr. 21.) Beatty does not argue that this subsection applies.

adaptive functioning that began prior to Beatty's attainment of age 22. (Tr. 21.) This determination is supported by substantial evidence on the record as a whole.

With regard to the required IQ scores, Beatty was administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") in December 1981 at the age of 17, and received a Full Scale IQ score of 74, a Verbal IQ score of 74, and a Performance IQ score of 76. (Tr. 21, 226-27.) The examiner indicated that Beatty's scores were in the borderline range of intelligence, and found that the scores were a valid and reliable indication of Beatty's level of intellectual functioning. *Id.*

The ALJ acknowledged that Beatty subsequently underwent IQ testing in connection with a January 2016 psychological consultative examination, and received a Full Scale IQ score of 67, Perceptual Reasoning score of 73, and Verbal Comprehension score of 74. (Tr. 22, 424.) The examiner, Thomas Spencer, Psy.D, found that Beatty's Full Scale IQ score was "a bit lower than what the available records suggests and what was expected given his education and work history." (Tr. 424.) As a result, Dr. Spencer diagnosed Beatty with BIF rather than an "intellectual disability." *Id.* The ALJ remarked that Beatty was involved in a motor vehicle accident that occurred well after he turned 22, which reduced his cognitive functioning. (Tr. 22.)

The ALJ also determined that Beatty did not have the requisite deficits in adaptive functioning. In making this determination, the ALJ considered the four areas of mental functioning known as the "paragraph B" criteria. (Tr. 18.) The ALJ explained the "paragraph B" criteria as follows:

> To satisfy the "paragraph B" criteria, the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

*Id.* The amended regulations changed the wording of the four "B" criteria. The "old" "B" criteria were: activities of daily living; social functioning; concentration, persistence and pace; and episodes of decompensation. *See generally*, 20 C.F.R., Pt. 404, Subpart P. App. 1, § 12.00.C.1-4 (2016 version). The "new" "B" criteria, effective January 17, 2017, are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *See generally*, 20 C.F.R., Pt. 404, Subpart P. App. 1, § 12.00.E.1-4 (2017 version).

The ALJ determined that the medical record did not support an extreme or two marked limitations in the relevant areas of mental functioning. *Id.* Instead, the ALJ found that Beatty had moderate limitations in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 19-20.)

Beatty first argues that the ALJ erred in evaluating the paragraph B criteria contained in the amended version of the listings effective January 17, 2017. The Court, however, has already determined that the ALJ properly applied the amended version of the regulations.

Beatty next contends that the ALJ's findings of only moderate limitations are not supported by substantial evidence, as the evidence establishes marked or extreme limitations. The Court will next discuss these findings.

In the area of understanding, remembering, or applying information, the ALJ noted Beatty's statement in his function report that he has difficulty following written instructions, but can follow spoken instructions. (Tr. 18, 177.) The ALJ next pointed out that Beatty reported he was able to cook meals daily, which evidenced an ability to follow at least one or two-step instructions. (Tr. 19, 174.) The ALJ stated that Beatty's treatment notes do not reflect

significant difficulties following through with medical advice or a treatment regimen due to memory functioning, minimal insight, or other mental abnormalities. (Tr. 19.) The ALJ concluded that Beatty has some limitations in his ability to understand, remember, or apply information, but they are no more than moderate. (Tr. 19.)

With regard to interacting with others, the ALJ noted Beatty reported that he spent time with others including his brother, attended church, and saw a friend once a month. (Tr. 19, 176.) Beatty reported that he did not get along with his neighbors because "they gossip too much," and that he did not get along with others at one of his past jobs. (Tr. 19, 177, 178.) He explained that he was a victim of harassment at one of his past jobs. (Tr. 48.) The ALJ stated that the record does not reflect serious limitations in cooperating with others, avoidance of interpersonal relationships, or social isolation; and the treatment notes do not note any significant difficulties developing rapport with medical professionals, diminished eye contact, or abnormal demeanor. (Tr. 19.) The ALJ therefore found that Beatty has no more than moderate difficulties in interacting with others. Beatty points to past incidents in which he was a victim of bullying, harassment, or violence in arguing he has greater limitations in interacting with others. As Defendant points out, however, these incidents are "not a reflection of Plaintiff's abilities, but the abilities of the other individuals." (Doc 26 at p. 6 n. 3.)

Concerning his ability to concentrate, persist, or maintain pace, Beatty reported that he can only pay attention for one hour and cannot finish tasks, although the ALJ noted his mental status examinations did not routinely demonstrate serious deficits or abnormalities in his attention or concentration. (Tr. 19, 177.) The ALJ stated that Beatty's treatment notes do not reflect significant difficulties with performing simple calculations, staying on task during his examinations, or maintaining a conversation with an examiner. (Tr. 19-20.) The ALJ found that

Beatty has some limits in his concentration, persistence, or pace, but they are not more than moderate.   (Tr. 20.)

Regarding Beatty's ability to adapt or manage himself, the ALJ cited Beatty's reports that he had no problems with personal care.   (Tr. 20, 174.)   Additionally, Beatty testified that he could prepare meals, clean the house, use a yard trimmer, wash dishes, drive a car, go out alone, go shopping alone, and manage his finances. (Tr. 20, 174-76.)   The ALJ stated that treatment notes do not reflect significant diminished hygiene.   (Tr. 20.)

Finally, in discussing Beatty's adaptive functioning, the ALJ found that Beatty's long work history supports that he has not had significant deficits in his adaptive functioning since before he turned twenty-two.   (Tr. 25.)   Beatty performed gainful activity both before and after the age of 22.   (Tr. 148, 155, 165.)   Beatty testified that he worked as a welder for seven years, a position that is classified as skilled work.   (Tr. 47, 52.)   He further testified that he had not returned to work because he had been unable to secure employment despite applying for positions.   (Tr. 46.) Substantial evidence supports the finding that Beatty did not suffer adaptive functioning deficits. *See Cheatum v. Astrue,* 388 F. App'x 574, 576-77 (8th Cir. 2010) (relying on semi-skilled work and daily living activities).

Thus, the ALJ's determination that Beatty did not satisfy the requirements of Listing 12.05 is supported by substantial evidence.

### 2.    Listing 12.02

Beatty next contends that he met Listing 12.02, the listing for neurocognitive disorders. He argues that the ALJ erred in failing to consider this Listing, because the ALJ acknowledged that Beatty was involved in a motor vehicle accident after he turned 22 that appeared to reduce his cognitive function.   (Tr. 22.)

The required level of severity for these disorders is met when the following criteria are met:

12.02 Neurocognitive disorders (see 12.00B1), satisfied by A and B, or A and C:

A. Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:
1. Complex attention;
2. Executive function;
3. Learning and memory;
4. Language;
5. Perceptual-motor; or
6. Social cognition.
AND
B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
1. Understand, remember, or apply information (see 12.00E1).
2. Interact with others (see 12.00E2).
3. Concentrate, persist, or maintain pace (see 12.00E3).
4. Adapt or manage oneself (see 12.00E4).
OR
C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.02 (2017).

The medical evidence reveals that Beatty presented to Hannibal Regional Hospital on June 30, 2010, with complaints of being "stressed out or depression or something like that." (Tr. 239.) He reported that he lived with his mother, who was dying from cancer. *Id.* Beatty indicated that he had been involved in a motor vehicle accident four years prior and sustained some back injuries. *Id.* He described symptoms of personality change due to head trauma from the accident, primarily involving affective lability. (Tr. 239-40.) Beatty also reported symptoms of a major depressive episode. (Tr. 240.) Beatty was not taking any psychiatric medications, although he

reported one suicide attempt in the past. *Id.* He was diagnosed with bipolar II disorder and personality change due to head injury from MVA. (Tr. 243.) Beatty was admitted and was treated with psychotropic medication. (Tr. 236.) Upon his discharge on June 23, 2010, his symptoms were diminished. *Id.* On mental status examination, Beatty was alert and oriented, pleasant and cooperative, his speech was within normal limits, his answers were to the point of the question, his thoughts demonstrated logical associations, his mood appeared neutral, his affect was appropriate, and his insight and judgment were adequate. *Id.*

Even if the evidence supports a decline in cognitive function consistent with the requirements of Listing 12.02A, Beatty is unable to demonstrate he meets the other requirements of the listing. Beatty does not contend he meets section (C), and there is no evidence in the record that this section is applicable. As to 12.02B, the ALJ found that Beatty did not have any extreme or marked limitations in the four areas of mental functioning when considering Listing 12.05. As such, the ALJ's failure to address Listing 12.02 is harmless.

In sum, the ALJ did not err in finding Beatty did not meet or equal a listed impairment at step three. The Court will next determine whether the ALJ's RFC finding is supported by substantial evidence.

### B. RFC Determination

As an initial matter, the Court notes that Beatty's insured status is relevant in this case. Beatty alleged an onset of disability date of December 20, 2007, and his insured status expired on December 31, 2012. To be entitled to benefits under Title II, Beatty must demonstrate he was disabled prior to December 31, 2012. *See* 20 C.F.R. § 404.130. Thus, the period under consideration in this case is from December 20, 2007, through December 31, 2012.

RFC is what a claimant can do despite his limitations, and it must be determined on the

basis of all relevant evidence, including medical records, physician's opinions, and the claimant's description of his limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *See Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

### 1. Mental RFC

The ALJ found that, through Beatty's date last insured, he had the mental RFC to perform simple, routine, and repetitive tasks; could make simple work-related decisions; and could have no more than occasional interactions with supervisors, co-workers, and the public. (Tr. 22.)

The ALJ stated that Beatty has been diagnosed with multiple mental impairments including BID, depressive disorder, and bipolar II disorder, with overlapping symptomology. *Id.* The ALJ noted that, although Beatty was hospitalized on one occasion for depressive symptoms in June 2010, he has not received any regular treatment from a mental health professional or primary care provider. *Id.*

The ALJ next discussed the January 2016 findings of consultative psychologist Dr. Spencer. Beatty reported that he worked as a welder for twenty years, but had not worked in approximately nine years. (Tr. 422.) Beatty explained that his brother wanted him to care for

their mother until her death, and he did not return to the work force after her 2010 death because "nobody wanted to hire" him. *Id.* Beatty reported that he had a "learning disability," and that he had been "tormented in the past" and "sexually harassed" in the workplace. *Id.* He had received special education services beginning in the fourth grade, graduated from high school, and completed vocational programs in welding in high school and after high school. *Id.* He noted some limitations in reading and writing, and said that he learned better hands-on. *Id.* Beatty reported that he got along in the workplace and was never fired over an "attitude." *Id.* He lived in his mother's home with his brother. *Id.* Beatty reported that he was able to complete his activities of daily living each day without prompting, could prepare simple meals, do the laundry, clean up after himself, and manage his finances. *Id.* He cut firewood for cash, enjoyed fishing, and watched television frequently. (Tr. 423.) Beatty characterized his mood as "okay," although he reported depression due "in part to Obama's presidency although he also said he generally feels judged and bullied." (Tr. 423.) Upon examination, Dr. Spencer noted Beatty was unkempt but had no obvious odor, his eye contact was fair, his speech was within normal limits, he did not look to be in physical distress, he ambulated without assistance and with no obvious difficulty, he was cooperative and a "decent historian," his insight and judgment were "fairly intact," he was alert and oriented, he was not paranoid or grandiose, and his flow of thought was intact. *Id.* As previously noted, Beatty received a Full Scale IQ score of 67, placing him in the Extremely Low range of functioning, but Dr. Spencer found this was lower than the record suggests and given his education and work history. (Tr. 424.) Dr. Spencer diagnosed Beatty with unspecified depressive disorder and BIF. *Id.*

Dr. Spencer completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which he expressed the opinion that Beatty had moderate limitations in his

ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations and changes in a routine work setting; and mild limitations in all other areas. (Tr. 425-26.) He found that Beatty was not capable of managing benefits in his best interest. (Tr. 427.)

The ALJ summarized Dr. Spencer's report, noting that his mental status examination demonstrated no indications of significant abnormalities in mood, attention, memory, orientation, thought content, appearance, goal-directed thought process, judgment, insight, psychomotor activity, speech, concentration, recall, cognitive functioning, hallucinations, or suicidal ideations. (Tr. 24.) With regard to Beatty's IQ scores, the ALJ stated that the record "does reflect a slight decrease but one that is still consistent with borderline intellectual functioning." *Id.* The ALJ assigned "considerable but not full weight" to Dr. Spencer's opinions; and explained that Dr. Spencer provided a detailed explanation of his examination and opinions, yet the examination occurred almost four years after Beatty's date last insured. (Tr. 26.)

The ALJ stated that the medical evidence revealed that Beatty may have difficulties with social interactions and with greater than simple tasks that would reduce his ability to perform work activities, but the record did not reflect "a significant loss of abstraction or intellectual ability, or an inability to learn new information, remember information that was known sometime in the past, interact with verbal and nonverbal communication, control his movements, or control his behavior, such that further limitations beyond those in the determined residual functional capacity would be appropriate." (Tr. 25.)

In addition to the objective medical evidence, the ALJ considered the following evidence relating to Beatty's subjective complaints: his prior work record showing a long work history including performance of some skilled work; activities of daily living inconsistent with his

allegations of disability, such as his ability to prepare meals, do yard work, wash dishes, drive a car, go out alone, go shopping alone, perform household chores, and cut logs for firewood; and the fact that Beatty received little medical treatment during the relevant period. (Tr. 25-26.) The ALJ found that Beatty's subjective allegations were not entirely consistent with the medical evidence and other evidence of record. (Tr. 26.)

The ALJ concluded that Beatty's mental impairments limit his ability to carry out greater than simple tasks and interact with others. This conclusion is supported by substantial evidence, including Dr. Spencer's examination and opinions, Beatty's prior work history, and his reported daily activities.

### 2. Physical RFC

Beatty argues that the ALJ failed to fully and fairly develop the record regarding his physical RFC. Specifically, he contends that the record contains no medical evidence addressing his physical ability to function in the workplace that supports the ALJ's RFC assessment.

While the ALJ "has a duty to fully and fairly develop the evidentiary record," *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012), "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). Where other evidence in the record provides a sufficient basis for an ALJ's decision, then an ALJ "is permitted to issue a decision without obtaining additional medical evidence." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (internal quotation marks and citation omitted). Importantly, an ALJ's duty to develop the record is not never-ending. *McCoy*, 648 F.3d at 612.

The ALJ found that there was evidence of pain in the record; however, the severity alleged by Beatty was not supported by the medical evidence. (Tr. 23.) The ALJ stated that, in

December 2011, Beatty presented to Janet Myers, D.O., with complaints of back pain beginning in August 2011 after being attacked while incarcerated. (Tr. 23, 420.) Upon examination, Beatty's range of motion of the lumbar spine was limited to 70 degrees forward bending and 10 degrees backward bending; Dr. Myers noted tenderness in the lumbar spine with paravertebral spasms; straight leg raise test was negative on the right leg and "questionable" on the left leg at 45 degrees; strength testing was equal bilaterally at +4/5 in the lower and upper extremities; and Dr. Myers noted multiple lesions in the upper thoracic area, with paravertebral spasms and tenderness present. (Tr. 420.) No sensory or motor deficits were found. *Id.* The ALJ noted that Beatty underwent x-rays at that time, which revealed only mild spondylosis of the thoracic spine, minimal spondylolisthesis of L5 on S1, moderate degenerative changes at L4-S1, and mild lumbar curvature convex. (Tr. 23, 416-17.) Dr. Myers diagnosed Beatty with low back pain with radiculopathy, mid back pain, and degenerative disk disease. (Tr. 23, 420.) She prescribed Flexeril[3] and recommended that Beatty apply heat. (Tr. 23, 420.) The ALJ noted that Beatty received conservative treatment from Dr. Myers, consisting of manual adjustments and prescription of Flexeril in January 2012, but no further treatment or complaints for back pain until April 2014. (Tr. 23, 418-19, 340.)

In April 2014, Beatty sought treatment for back pain with primary care provider Crisanto Gualberto, M.D. (Tr. 23, 340.) He underwent x-rays of the lumbar spine, which revealed advanced degenerative changes of the lower lumbar spine. (Tr. 341.)

Beatty started receiving treatment for his low back pain at the Missouri Orthopaedic Institute on May 23, 2014. (Tr. 23, 362-64.) He complained of neck and lower back pain for two years, which he rated as a seven on a scale of one to ten. (Tr. 362.) He indicated that sitting and

---

[3]Flexeril is indicated for the treatment of muscle spasms. *See* WebMD, http://www.webmd.com/drugs (last visited July 12, 2019).

walking made his symptoms better, whereas lying down, standing, bending and twisting made his symptoms worse. *Id.* Upon examination, Laura Billings, AHCNS, noted tenderness to palpation bilaterally over his sacroiliac notches and his spinous process at L5; his flexion and extension were normal; his sensation was grossly intact; he was able to heel walk and toe walk without difficulty; and his straight leg raise test was positive bilaterally at 45 degrees. (Tr. 363-64.) X-rays Beatty underwent of his lumbosacral spine on that date revealed "mild spondylolisthesis" at L5-S1 and "mild spondylosis" at other levels of the lumbar spine. (Tr. 23, 365.) Ms. Billings stated that she would treat Beatty's low back pain conservatively by prescribing a steroid to address any acute inflammation; Tramadol[4] and Flexeril for pain and spasm; and exercises. (Tr. 364.) Beatty presented for follow-up on July 2, 2014, at which time he reported he had not taken any of this medication and did not do any of the prescribed exercise. (Tr. 359.) On examination, he was able to walk on his heels and toes without difficulty. (Tr. 359.) X-rays of the cervical and thoracic spine performed on that date revealed mild to moderate spondylotic changes throughout the cervical spine and mild degenerative disc disease of the thoracic spine. (Tr. 359-61.) On August 14, 2014, Beatty reported that his neck pain had improved with medication and the prescribed exercises, but his lower back pain had not improved. (Tr. 356.) His examination was unchanged, with the exception of a positive straight leg raise on the right. *Id.* Ms. Billings ordered an MRI of the lumbar spine. (Tr. 357.)

Beatty underwent an MRI of the lumbar spine on August 20, 2014, which revealed L5 on S1 spondylolisthesis with left-sided L5 spondylolysis; moderate to severe multilevel lumbar spondylosis with severe left and mild to moderate right neural foraminal stenosis; severe right and

---

[4]Tramadol is indicated for the treatment of moderate to moderately severe pain. *See* WebMD, http://www.webmd.com/drugs (last visited July 12, 2019).

mild left neural foraminal stenosis at L3-4; and moderate bilateral neural foraminal stenosis at L4-5. (Tr. 355.)

On September 2, 2014, Ms. Billings administered an epidural steroid injection at L5-S1. (Tr. 350.) On September 23, 2014, Beatty reported that the steroid injection did not help, although the pain medication was helping somewhat with his symptoms. (Tr. 349.) Ms. Billings referred Beatty for an orthopedic consult. *Id.*

Beatty saw orthopedic surgeon Thomas Reinsel, M.D., on October 23, 2014. (Tr. 342.) He complained of low back pain but denied any lower extremity radicular symptoms or numbness. *Id.* Beatty reported that he has to get up and move around after sitting. *Id.* He stated that he has to rest or take pain medication after walking "half a mile." *Id.* On examination, Beatty's gait was slow but normal; he was able to walk on his heels and toes; he was able to reach his ankles with his fingertips with only slight pain and his extension was normal with pain; his motor strength was normal; his sensory examination was normal; and his straight leg raise test was negative. (Tr. 343.) Dr. Reinsel's assessment was he did not think "surgery for this gentleman would be his best choice." *Id.* He stated that he "could do a fusion of his lumbar spine, but I think this would probably limit his function and may not help with his chronic back pain and symptoms." *Id.* Beatty questioned Dr. Reinsel about disability eligibility. (Tr. 343-44.) Dr. Reinsel encouraged Beatty "to exercise and keep himself in shape and be careful how he bends, lifts and twists." (Tr. 344.)

The ALJ noted that Beatty was next seen by primary care provider Dr. Gualberto in March 2015, at which time he requested Dr. Gualberto complete disability papers for his lawyer. (Tr. 23, 366.) He stated that the record does not reflect any subsequent treatment or complaints. (Tr. 23.)

The ALJ found that Beatty's imaging "certainly supports that the claimant has some pain in his spine, which reflects that the claimant's alleged conditions were genuine," although the objective medical evidence and clinical signs were only "moderately supportive," and demonstrated "very limited conservative treatment." (Tr. 24.) The ALJ acknowledged Beatty's testimony that he lacked insurance and was unable to afford treatment; and indicated that was considered. *Id.* The ALJ concluded that the objective evidence "does not fully support the claimant's subjective allegations regarding the effects of those impairments on h[is] functioning and do not support limitations beyond a range of sedentary exertional work." *Id.*

The Court finds that substantial evidence supports the ALJ's physical RFC determination. As previously discussed, Beatty must demonstrate disability prior to the expiration of his insured status on December 31, 2012. Beatty first complained of back pain in December 2011 and indicated it had started two months prior. (Tr. 420.) At that time, Beatty's physical examination revealed some findings, such as tenderness, spasms, and limitation of range of motion of the lumbar spine (Tr. 420); and imaging revealed minimal spondylolisthesis of L5 on S1 and moderate degenerative changes at L4-S1. (Tr. 416-17.) Beatty was treated conservatively with manual adjustments, Flexeril, and heat therapy in January 2012 and did not receive further treatment until April 2014, after the expiration of his insured status. Although subsequent imaging—particularly the August 2014 MRI—revealed more significant findings, it was consistently found that Beatty's gait was normal and he was able to walk on his heels and toes. (Tr. 364, 359, 356, 343.) Dr. Reinsel encouraged Beatty to exercise, and only advised him to be careful when bending, lifting, and twisting. (Tr. 344.) The medical evidence of record is consistent with the performance of sedentary work with additional limitations in climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 22.)

The ALJ also considered Beatty's own statements in determining his RFC. At Beatty's October 2014 orthopedic consultation, he reported that he was able to walk half of a mile before having to stop due to back pain. (Tr. 342.) Beatty also reported that sitting and walking made his symptoms better, whereas lying down, standing, bending, and twisting made his symptoms worse. (Tr. 362.) In his function report, Beatty indicated that his impairments only affected his ability to lift and bend and not his abilities to sit or walk, and admitted that he could lift between ten and twenty pounds. (Tr. 177, 193.) Beatty testified at the administrative hearing that he had no difficulty carrying groceries into his house, or cutting logs for firewood. (Tr. 43-44.)

Where, as here, the RFC is supported by substantial evidence on the record as a whole, the ALJ was not required to obtain a consultative examination or a doctor's opinion to determine plaintiff's work-related limitations. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (ALJ not required to seek additional information from treating physicians or order consultative examination where medical record is adequately developed); *Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011) (ALJ required to supplement record only if the existing medical record does not provide sufficient evidence to determine whether the claimant is disabled).

The ALJ had sufficient available evidence to determine the merits of Beatty's disability claim. That evidence included imaging showing only mild to moderate degenerative changes of the thoracic and lumbar spine during the relevant period; conservative treatment for his back impairment during the relevant period; Dr. Reinsel's advice after the relevant period to exercise, and only limit his bending, lifting, and twisting; and Beatty's own testimony about his limitations that was consistent with the performance of a range of sedentary work. Thus, the ALJ did not err by failing to further develop the record.

The ALJ then found, with the assistance of a vocational expert, that an individual with

Beatty's RFC could perform the positions of lens inserter, patcher, and polisher.   (Tr. 28, 53-54.)

An ALJ's decision is not to be disturbed "'so long as the...decision falls within the available zone of choice.   An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)).   Although Beatty articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.   *See Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (concluding that "[w]hile it was not surprising that in an administrative record which exceeds 1,500 pages, [claimant] can point to some evidence which detracts from the Commissioner's determination, good reasons and substantial evidence on the record as a whole support the Commissioner's RFC determination).

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of September, 2019.